## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

      v.

BARRY R. BEKKEDAM,

      Defendant.

Civil Action No. _____

<u>Jury Trial Demanded</u>

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY

1.      From April through October 2009, Barry R. Bekkedam ("Bekkedam")—the former owner, Chairman, and Chief Executive Officer of the investment advisory firm Ballamor Capital Management, LLC ("Ballamor")—fraudulently induced, or assisted in inducing, his advisory clients and others to invest approximately $100 million in a fund that purportedly purchased lawsuit settlements from now-convicted Ponzi-schemer Scott Rothstein.

2.      Beginning in 2005, Rothstein falsely claimed that certain of his clients—plaintiffs who had reached confidential settlements in sexual harassment, whistle-blower, and qui tam actions against large corporate defendants—were willing to assign the full amount of their periodic settlement payments in exchange for immediate, but discounted, lump sum cash payments. Rothstein told prospective purchasers of the settlements that, although the settling defendants had deposited the full amount of the settlements in trust accounts at his law firm Rothstein, Rosenfeld and Adler, PA ("RRA"), the plaintiffs were to be paid their settlements in

periodic installments to ensure the plaintiffs' compliance with the settlements' confidentiality provisions.

3. In early 2009, Bekkedam was approached by George Levin ("Levin") to help solicit investments to purchase Rothstein settlements. Levin had already invested millions in the Rothstein settlements, both individually and through entities that he controlled, and these investments were at risk if Levin could not find additional investors. In April 2009, Levin and Bekkedam, among others, formed the Banyon Income Fund, LP (the "Banyon Fund") for the purpose of investing in Rothstein's purported settlements. Levin controlled the General Partner of the Banyon Fund and Ballamor served as the Limited Partner Representative to the Banyon Fund.

4. When soliciting his advisory clients and other prospective investors to invest in the Banyon Fund, Bekkedam made material misrepresentations and omissions regarding the level of due diligence he and Ballamor had performed, including their access to information confirming the existence of the settlement funds, the authenticity of Rothstein's investment program, and the overall safety of investing in the Rothstein settlements.

5. Despite lacking essential information regarding Banyon Fund's investments in the Rothstein settlements, Bekkedam solicited investments from advisory clients and other investors while complaining to Levin that "[w]hen I meet with people and say we have this due diligence and don't it makes it even more difficult in this environment." Bekkedam continued to solicit investments even after Levin forwarded an email from Rothstein refusing to provide Bekkedam with "any access to any of our files etc. until they give us some real assurance as to their ability to perform on this latest most important funding."

6.      Bekkedam also concealed from his advisory clients and other prospective investors the nature of his relationship with Levin and the clear conflicts of interest resulting from the financial arrangements between Levin and Bekkedam and his affiliates. Throughout 2009, Levin and Bekkedam engaged in a series of transactions designed to funnel money to Bekkedam and his related entities in exchange for Bekkedam's solicitation of investors in the Banyon Fund. The transactions included Levin's purchase of approximately $3 million in municipal bonds from Bekkedam, Levin's agreement to help Bekkedam restructure $10 million of his personal and business debt, Levin's agreement to invest up to $5 million in Ballamor, and Levin's purported investment of $5 million in a bank co-founded by Bekkedam with an agreement to invest up to an additional $13 million.

7.      Rothstein's investment program was nothing more than a Ponzi scheme. There never were any settlement funds; there never were any settlements; there never were any plaintiffs who settled their claims. Until the time the Ponzi scheme collapsed in late October 2009, Bekkedam continued to make material misstatements and omissions to his advisory clients and other prospective investors to induce them to invest in the Banyon Fund. At that time, Banyon investors had received approximately $2 million in interest payments, with their principal investment lost in the Ponzi scheme.

8.      As a result of the conduct described in this complaint, Bekkedam violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [C.F.R. § 240.10b-5(b)], Section 17(a)(2) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(2)], and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## JURISDICTION AND VENUE

9.     The Commission brings this action pursuant to Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)], Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)], and Sections 209(d) and 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(d) and 80b-9(e)] to enjoin such acts, transactions, practices, and courses of business and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

10.     The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 209(d), 209(e), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), and 80b-14].

11.     Venue in this district is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  Among other things, certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within the Eastern District of Pennsylvania.

## DEFENDANT

12.     **Barry R. Bekkedam**, age 47, lived in Villanova, Pennsylvania during the time period in which the conduct described herein took place, and currently lives in Hobe Sound, Florida.  From approximately 1999 through April 2010, Bekkedam was the founder, Chairman, and Chief Executive Officer of Ballamor Capital Management, Inc., and he owned 100% of the company.

## RELATED PERSONS AND ENTITIES

13.     **Ballamor Capital Management, LLC** is a Pennsylvania limited liability company with its principal place of business in Radnor, Pennsylvania. From August 1999 until it withdrew its registration in April 2010, Ballamor was an SEC-registered investment adviser.

14.     **Ballamor Capital Management, Inc.** is a Pennsylvania corporation with its principal place of business in Radnor, Pennsylvania. During the relevant time period, Ballamor Capital Management, Inc. owned 100% of the common membership interests in Ballamor.

15.     **Scott Rothstein**, age 51, was an attorney licensed by the State of Florida until he was permanently disbarred on November 25, 2009. He is currently serving 50 years in federal custody for operating a massive Ponzi scheme. Rothstein perpetrated his Ponzi scheme through RRA, which was based in Fort Lauderdale, Florida. RRA has since disbanded and been forced into bankruptcy as a result of Rothstein's Ponzi scheme.

16.     **George Levin**, age 73, lives in Fort Lauderdale, Florida. Levin was the managing member of several entities involved in investments with Rothstein, including Banyon 1030-32, LLC ("Banyon 1030-32"), the General Partner of Banyon Income Fund, L.P. In 1999, Levin and GGL Industries Inc. d/b/a Class Motor Carriages ("GGL")—a custom car business that Levin owned and operated—entered into a voluntary enforcement agreement with the State of Florida to settle consumer complaints. Simultaneously, GGL pled guilty to one count of federal wire fraud related to telephone solicitations made by the same company. On May 22, 2012, Levin was sued by the Commission for actions related to those described in this complaint in SEC v. Levin, et al., Case No. 12-cv-21917-ROSENBAUM/SNOW (S.D. Fl.).

17.     **Banyon Income Fund, LP** was a Delaware limited partnership with its principal place of business in Fort Lauderdale, Florida. The Banyon Fund was an investment fund whose

entire portfolio of investments consisted of Rothstein's purported settlements. The Banyon Fund and its securities were not registered with the Commission in any capacity. The Banyon Fund's General Partner was Banyon 1030-32 and its Limited Partner Representative was Ballamor.

18.     **Banyon 1030-32, LLC** was a Nevada limited liability company with its principal place of business in Fort Lauderdale, Florida. During the relevant time period, Levin was the managing member of Banyon 1030-32, and Levin and his wife wholly owned the company.

## FACTS

### A.     Bekkedam Founded, Owned, and Operated the Investment Adviser Ballamor

19.     Bekkedam founded, owned, and operated Ballamor, serving as its Chairman and Chief Executive Officer. Ballamor's investment management services were generally limited to the management of investment portfolios and consulting for individuals, investment limited partnerships, pension and profit sharing plans, trusts, estates, charitable organizations, and business entities. In April 2008, Ballamor purportedly managed over $2.5 billion in assets, although, by March 2009, the amount that Ballamor purportedly managed had decreased to approximately $1.75 billion.

20.     Ballamor provided investment management services on a fee-only basis, and generally charged an annual fee based upon a percentage of the market value of assets under management. The annual fee was typically 1% but could vary between 0.10% and 1.50%.

21.     Ballamor's advisory clients invested in private equity deals and in hedge funds in which they were either the only investors or the majority investors. Ballamor also recommended private placement securities, including debt, equity, and/or pooled investment vehicles. According to Ballamor, when it recommended that a client invest in private placement securities,

the company would not receive additional compensation from the issuer and, instead, would only receive its applicable investment advisory fees on the client's assets under management.

22.     Bekkedam met Levin in early 2009. At that time, investments that Bekkedam had recommended to Ballamor's advisory clients were underperforming. Additionally, Bekkedam was experiencing liquidity problems because of his recent divorce and his financial obligations to Ballamor. Bekkedam also lived a lavish lifestyle, traveling frequently.

23.     Bekkedam revealed to Levin that he was going through a period of financial difficulty. Levin agreed to help Bekkedam with the understanding that Bekkedam would raise $100 million from his advisory clients and others to fund the purchase of Rothstein's purported settlements.

### B.     Rothstein's Ponzi Scheme

24.     Beginning in 2005, Rothstein falsely claimed to represent plaintiffs who had reached confidential settlements in sexual harassment, whistle-blower, and qui tam actions against large corporate defendants, and started selling these fictitious settlements to outside investors.

25.     Rothstein explained to prospective purchasers that the defendants in these purported lawsuits had deposited the full amount of the settlements in RRA trust accounts for the benefit of the plaintiffs, but that the settlement agreements required that the plaintiffs be paid out in periodic installments to ensure the plaintiffs' compliance with the settlements' confidentiality provisions. Rothstein claimed that the plaintiffs were willing to assign their settlement payments from the RRA trust accounts in exchange for immediate, but discounted, lump sum cash payments. For example, Rothstein claimed that he sold one investor the right to receive a

$450,000 settlement paid out in three monthly $150,000 payments for an immediate payment of $375,000.

26.     Contrary to Rothstein's representations, there never were any legal settlements, and the plaintiffs and defendants did not exist.  The entire endeavor was a massive Ponzi scheme. Rather than using the funds provided to him by outside investors to purchase any such settlements, Rothstein used the funds to make payments due to prior investors and to support his lavish lifestyle.

27.     At the end of October 2009, Rothstein's scheme collapsed.  Shortly thereafter, Rothstein surrendered to federal authorities.  He pled guilty to federal criminal charges related to the operation of the Ponzi scheme and was sentenced to 50 years in federal custody.  Banyon investors, at that time, had received approximately $2 million in interest payments, and their principal investment was lost in the scheme.  Banyon investors were subsequently forced to seek recovery of their principal investment in various bankruptcy proceedings and through other private litigation.

**C.     Levin Personally and Through Entities He Controlled Invested Hundreds of Millions of Dollars in Rothstein's Ponzi Scheme**

28.     Levin first met Rothstein in early 2007 and soon began personally to invest in his discounted legal settlements.  As the number and dollar amount of Levin's settlement purchases increased, he began using one of his dormant legal entities, Banyon 1030-32, to purchase additional purported settlements from Rothstein.

29.     Within a few months of meeting Rothstein, Levin had purchased approximately $1.7 million in settlements.  Rothstein's demand for settlement funding, however, continued to grow.

30.     Levin began pursuing outside investors in an effort to secure other sources of capital.  In December 2007, Levin, through Banyon 1030-32, started offering investors promissory notes with the stated purpose of purchasing discounted legal settlements from Rothstein.

31.     The notes provided investors with scheduled payments at fixed interest rates ranging from 12% to 30% per year, with most from 18% to 20%.  The term of the notes was generally 180 days.  Banyon 1030-32 used the proceeds from the promissory notes to purchase purported discounted settlements from Rothstein in an attempt to profit from the amount by which the discounts on the total stream of settlement payments exceeded the interest payments owed to investors under the promissory notes.

32.     Levin initially marketed the promissory notes to his friends and acquaintances. As word spread, Levin contacted more and more potential investors and sold them promissory notes as well.

**D.     Rothstein's Scheme Began to Falter**

33.     While continuing to issue promissory notes through Banyon 1030-32, Levin obtained additional financing to purchase purported settlements from Rothstein.  Between April and November 2008, Levin, through separately created entities, entered into credit and security agreements with three New York-based hedge funds.  The hedge funds agreed to provide Levin's entities with lines of credit at fixed interest rates in order for Levin to purchase settlements from Rothstein.

34.     However, by December 2008, Levin's ability to purchase new settlements waned because the hedge funds were not approving full use of the lines of credit.  In early 2009, as the three hedge funds decreased their funding of Levin's purchase of additional settlements, Rothstein began to miss scheduled payments to Levin's entities under the purported settlements.

35.     In early 2009, Rothstein complained to Levin about the decreasing settlement funding, claiming that he had convinced his clients to settle with the promise of immediate funding and, without additional funding, he could not satisfy the promise of immediate payments to his clients.

36.     As a cover story for his need for additional funding, Rothstein told Levin that his and others' inability to provide settlement financing had caused him problems with the Florida Bar that put his law license in jeopardy. Rothstein falsely claimed that his clients—the purported plaintiffs—had filed complaints with the Florida Bar because he was unable to provide them with the promised immediate payments for their settlements. Rothstein further explained that, as a result, he could be disbarred, which would end the settlement funding arrangement he had with Levin.

37.     Rothstein claimed, in response, to have told the Florida Bar that he would suspend payments out of the RRA trust accounts so that the Bar would not take further action. The only way he could resume making payments, Rothstein said, was for Levin and his associate to provide him with an additional $100 million so that he could fund the commitments he supposedly had already made to purported plaintiffs.

38.     By mid-April 2009, Rothstein had ceased payments on a majority of the settlements supposedly owned by Levin and his associated entities, and the hedge funds had stopped advancing any money under the lines of credit.

39.     Levin had a significant personal stake in the success of Rothstein's purported investments, having invested a substantial amount of his own money—as well as his family's and friends' money—with Rothstein, later describing himself as "fully invested" in the Rothstein settlements.

### E. Bekkedam Committed to Raise $100 Million for the Banyon Fund

40.     Faced with pressure from Rothstein to secure additional funding for the purchase of purported settlements, Levin approached Bekkedam to raise the $100 million sought by Rothstein.

41.     Bekkedam, Levin, and an associate of Levin's created the Banyon Fund as the vehicle through which Bekkedam would solicit his advisory clients and other prospective investors to invest in Rothstein's purported settlements. The Banyon Fund was established as a limited partnership with Banyon 1030-32 serving as the General Partner and Ballamor acting as the Limited Partner Representative.

42.     The Banyon Fund issued an offering memorandum dated April 30, 2009, the "Confidential Offering Memorandum – Banyon Income Fund, LP" ("PPM"), which included financial statements and a Limited Partnership Agreement ("LPA").

43.     According to the PPM, the Banyon Fund's stated purpose was "to purchase, at a discount, settlements and related periodic revenue stream[s] . . . from individual plaintiffs" who had settled lawsuits or claims and "would otherwise receive their settlement amounts over a period of time." The PPM stated that the Banyon Fund would "be continuing a business strategy that [Banyon 1030-32] and its affiliates have been engaged in for approximately 2.5 years." The PPM also stated that, as of March 31, 2009, Banyon 1030-32 had successfully purchased more than $1 billion in settlements from Rothstein, almost half of which had already been repaid, and that over $550 million in receivables from previously purchased settlements was due to be paid.

44.     The PPM further stated that the Banyon Fund's "intended goal is to minimize risk while providing limited partners with the Preferred Return." The PPM guaranteed investors 12%

to 15% returns, and specified that investors would receive at least quarterly interest payments with their principal locked-up for 12 months.

45.    The LPA, included as an appendix to the PPM, set forth a number of provisions relating to Ballamor as Limited Partner Representative. For example, the LPA specifically required Banyon 1030-32 to provide Ballamor, as the Limited Partner Representative, with 24 hour on-line access to all banking records for each deposit account maintained by the Banyon Fund.

46.    The LPA also required Banyon 1030-32 to provide Ballamor with 24 hour on-line access to all records systems maintained by the Banyon Fund regarding the purchased settlements. Ballamor was further given the right, at any time, to verify the validity, amount or any other matter relating to any purchased settlements.

47.    The LPA further provided that the settlements would undergo a third-party verification process. Specifically, the Banyon Fund was required to conduct verification of each purchased settlement by a third party acceptable to Ballamor (the "Third Party Verifier"). The Third Party Verifier, in turn, was required to report its findings to Ballamor and Banyon 1030-32.

48.    Ballamor also had the right, under the LPA, to visit and inspect any of the Banyon Fund's properties, to examine and make abstracts or copies from its books and records, to conduct an audit and analysis of the purchased settlements and other assets and to discuss its affairs, finances and accounts with Banyon 1030-32 and the Banyon Fund's independent public accountants.

49.    Finally, the LPA further provided that Banyon 1030-32 was required to deliver to Ballamor, promptly upon receipt thereof, copies of all reports submitted to the Banyon Fund by

independent public accountants in connection with each annual, interim or special audit of the financial statements of the Banyon Fund.

## F. Bekkedam Raised Money for the Banyon Fund Based on Material Misrepresentations and Omissions

50.     Between April and October 2009, Bekkedam fraudulently raised, or assisted in raising, approximately $100 million in Banyon Fund investments from approximately 90 investors, including at least $30 million from Bekkedam's advisory clients. Throughout this time period, Bekkedam made material misrepresentations and omissions when recommending the Banyon Fund to his advisory clients and other prospective investors, and provided to potential investors—without correction—a PPM that materially misstated the information about the Banyon Fund available to Bekkedam and Ballamor while also concealing the true nature of the business dealings between and among Levin, Bekkedam, and Ballamor.

### i. Bekkedam Made Material Misstatements and Omissions Concerning Due Diligence Performed and the Nature and Safety of Investments in the Banyon Fund

51.     When soliciting investments for the Banyon Fund from his advisory clients and others, Bekkedam made material misstatements and omissions about the level of due diligence performed, his access to information confirming the existence of the settlement funds and authenticity of Rothstein's investment program, and the overall safety of the investment.

52.     In communications with existing and prospective advisory clients, Bekkedam and Ballamor touted the due diligence performed on recommended investments, including:

  a.  bi-annual third-party background checks, including employment history and resume verification and civil and criminal litigation, regulatory, and media searches;

b. verification of controls/processes with service providers, including verifying prime broker and administrator qualifications and independence; interviewing the auditor who prepared audited financial statements; and verifying third-party net asset value calculations;

c. onsite due diligence interview, including confirming operating processes of back-office and reviewing risk management policies and procedures; and

d. full review of all offering documents, including any partnership agreement, subscription agreement, or private placement memorandum.

53.     With regard to the Banyon Fund, Bekkedam orally, and in writing, represented to his advisory clients and other prospective investors, among other things, that:

a. the Banyon Fund was low risk and safe;

b. Bekkedam and Ballamor had conducted extensive due diligence on the Banyon Fund;

c. Bekkedam and Ballamor had transparency of, and continuous access to, Rothstein's purported trust accounts at TD Bank; and

d. Bekkedam and Ballamor received reports verifying the purported settlements.

54.     For example, in an email exchange on June 23, 2009 between Bekkedam and an advisory client—who, after investigating Levin's background, advised Bekkedam that it was precluded from "investing the plan's money in a business where [Levin] is the managing member of the general partner"—Bekkedam continued to recommend that his client invest in Banyon by stating, among other things:

With all due respect the oversight of the fund general partner has little impact on its daily operation success or failure. That being said we have done extensive due diligence on Mr. Levin's background including our involvement in his estate planning and family office setup. . . . Not sure what else you would want considering we have complete transparency, fully audited financials, audited collateral assignments 1/4ly, direct viewership of account balances daily, etc.? You will not find a more honest and investor friendly GP anywhere. . . . [W]e highly suggest we revisit and also as a fiduciary and the Investment Manager to the [advisory client] we consider this a highly appropriate and well thought out investment.

55.     Similarly, in an August 2, 2009 email to the representative of an advisory client,

Bekkedam recommended investing in the Banyon Fund by touting Levin as well as Bekkedam's

and Ballamor's access to due diligence material:

[Levin] is one of the most respected business people in the country and a major philanthropist. I will have [Ballamor's Chief Compliance Officer and General Counsel] in my office respond as we did a very detailed background check and researched the lawsuit in question. . . . In this strategy we have complete transparency and access to any and all information. [Ballamor's Chief Compliance Officer and General Counsel] and the law firm representing the partnership spent time in Florida at both the law firm and in [Levin's] office during the due diligence process. . . . We have transparency at both the partnership level and the fund level. . . .

Bekkedam further represented to this advisory client that the Banyon Fund was the "highest

reward lowest risk investment [Bekkedam had] ever seen," and that he had access to the TD

Bank accounts and had verified the funds. Shortly thereafter, this advisory client invested

$900,000.

56.     In fact, Bekkedam performed neither the due diligence represented to advisory

clients and prospective investors, nor the due diligence that Ballamor's policies otherwise

required. In addition, Bekkedam never had access to the financial information that Ballamor was

purportedly entitled to pursuant to the LPA:

a. Bekkedam and Ballamor conducted very little due diligence on the Banyon Fund and the purported investment strategy;

b. Bekkedam and Ballamor repeatedly failed to receive information requested to substantiate Rothstein's investment program;

c. Bekkedam and Ballamor never had any access to the TD Bank accounts; and

d. Bekkedam and Ballamor did not receive verification reports directly from the Third-Party Verifier for each settlement purchased by the Banyon Fund.

57. Further Bekkedam had no basis to tell his advisory clients and other prospective investors that the Banyon Fund was low risk and safe, particularly given his lack of due diligence and lack of access to information confirming the existence of the settlement funds and authenticity of Rothstein's investment program that, under the very terms of the PPM, he should have received.

58. Indeed, contemporaneously with recommending the Banyon Fund to investors, Bekkedam complained to Levin that the continued lack of due diligence would adversely affect his ability to raise additional funds. For example, in a September 3, 2009 email—four months after Bekkedam started raising money from investors—Bekkedam wrote to Levin, stating:

> This is where it gets challenging as many are requesting due diligence that we need asap such as;
> 1) Copies of all of [Third-Party Verifier's] assignment audit information prior to now and as it is completed.
> 2) The "restricted account" information that TD Bank will only fund from [Rothstein's] accounts to Banyon based on [Rothstein's] comments last week.
> 3) Access for Ballamor as an investor representative to the daily balances at TD . . . .

59. In that same email, Bekkedam admitted his deception:

I have been getting investors to commit based on my reputation but at the next level it is tougher if not impossible without help bridging the due diligence gap. . . . We are weeks behind on packaging due diligence to prospective investors because we need these basics. I am having critical meetings in the next few weeks that will invariably ask for this stuff. Existing investors have also been clamoring.

60. On September 22, 2009, Levin forwarded an email to Bekkedam from Rothstein wherein Rothstein made clear that Bekkedam would not get access to any financial information without an assurance that he could raise the millions of dollars sought by Levin and Rothstein. Rothstein wrote:

I do not believe that we should provide [Bekkedam and Ballamor's Chief Compliance Officer and General Counsel] with any access to any of our files etc. until they give us some real assurance as to their ability to perform on this latest most important funding.

61. Despite a total lack of required due diligence, and "clamoring" investors, Bekkedam continued to solicit prospective investors in the Banyon Fund based on the same misstatements and omissions.

62. For example, on October 3, 2009, when discussing an audit of the Banyon Fund with one large investor, Bekkedam said: "They always get us what we need . . . ."

63. In an October 8, 2009 email to Levin, Bekkedam admitted that he had been making material misstatements to his advisory clients and other prospective investors: "When I meet with people and say we have this due diligence and don't it makes it even more difficult in this environment."

64.     And yet, just a few days later, Bekkedam solicited a prospective Banyon Fund investor by stating:

> Remember that the strategy is very simple and has complete transparency. We view the TD bank account daily. We receive bi-weekly collateral audit reviews from an independent firm etc etc.

65.     On October 26, 2009, just days before Rothstein's scheme collapsed, but while Bekkedam was still soliciting and receiving money from prospective investors, Bekkedam again emailed Levin and told him that he still had not received the required verification reports from the Third-Party Verifier: "I don't want to feel like a pain, but I have existing people expecting that we are doing our due diligence, new people wanting our due diligence, you and Scott [Rothstein] needing money, and I am doing the best I can."

66.     Two days later, Bekkedam again emailed Levin, stating: "On due diligence, can you keep pushing [Levin's associate] to get us what we need. It is getting even [Ballamor's Chief Compliance Officer and General Counsel] a bit worried that we are not getting audit reports and [a Ballamor employee] still cannot gain access to the accounts at TD."

### ii.    Bekkedam Made Material Misstatements and Omissions Concerning Rothstein's Purported Problem with the Florida Bar

67.     Bekkedam also made material misstatements and omissions to his advisory clients and other prospective investors in failing to disclose Rothstein's purported issues with the Florida Bar, which Bekkedam was aware threatened Rothstein's law license and could have terminated the entire settlement fund strategy.

68.     Bekkedam was aware of Rothstein's purported bar issues and alleged freeze on settlement payments at a time when he was soliciting his advisory clients and other prospective investors to invest in the Banyon Fund. And yet, he touted the Banyon Fund as the "highest

18

reward lowest risk investment [Bekkedam had] ever seen," and as a "no brainer" and safe investment with little risk.

69.     In an August 19, 2009 email forwarded to Bekkedam by Levin, Rothstein discussed his purported issues with the Florida Bar and the freeze on funding, stating:

> Are we expecting any funding this week or next? . . .  We have not seen much from Barry and I am being pressured by the Bar to demonstrate a steady flow of funding. . . . Barry promised 10 [million dollars] weeks ago that never appeared and then promised money from [another prospective investor] that never appeared ... approx. 4.5 [million dollars.]  The quicker I demonstrate that we are back in the game the quicker I can release all the funding. . . .

70.     On September 17, 2009, Rothstein sent Levin another email, which Levin forwarded to Bekkedam and Ballamor's Chief Compliance Officer and General Counsel, stating: "Having quite a bad day with the asswipes from the Bar...they are all over me on this.  Please let me know what Barry is doing."

71.     On September 22, 2009, Rothstein told Levin and his associate that he was concerned that Bekkedam would not fulfill his commitment to raise $40 million by the end of the month: "If I do not fund, I will likely be shut down.  Which in turn will shut you down.  Which in turn will blow up our entire strategy."  Again, Levin forwarded this email to Bekkedam.

72.     And again, on October 6, 2009, Rothstein emailed Levin and [Levin's associate] that he did not understand why he had not heard from Bekkedam notwithstanding Bekkedam's promises for additional funding:

> Hey my brothers. . . .
> I do not understand the radio silence from Barry.  He said 40 [million dollars]....he promised 40 [million dollars]>>>>he delivered 15 [million dollars]. I just don't get it.  Because of this nonsense, I am sitting with 8 [million dollars] of my own money invested in this deal.....VERY BAD......I can not invest in these. And I do not want anymore bar heat now that we finally made them go away for a while. . . .

Levin forwarded Rothstein's email to Bekkedam, adding:

> Personal and confidential!!! Needs immediate attention! Help! All this and all we need is another $8,000,000 to at least get past the current emergency!

73.     Despite the repeated disclosure to Bekkedam of funding issues and bar difficulties, Bekkedam never disclosed to Banyon Fund investors Rothstein's purported Florida Bar issue, that the investment program could be shut down, or that Rothstein had ceased releasing money to prior investors in Rothstein's purported settlements.

74.     To the contrary, for example, Bekkedam secured a $2 million investment from an advisory client on October 23, 2009, by telling the client that Banyon was a great deal with little risk.

### iii.     Bekkedam Made Material Misstatements and Omissions Concerning his Business Dealings with Levin

75.     In addition to misrepresentations regarding due diligence and the safety of investments in the Banyon Fund, Bekkedam misrepresented and failed to disclose to his advisory clients and other potential investors his relationship with Levin that involved, in part, a series of transactions and other arrangements between Levin and Bekkedam and affiliated entities that funneled millions of dollars to Bekkedam and others.

76.     The Banyon Fund PPM, which Bekkedam provided to advisory clients and other potential investors during the relevant time period, purported to disclose a relationship between and among Levin, Bekkedam and Ballamor, stating:

> Ballamor Capital Management, Inc., an investment adviser registered with the Securities and Exchange Commission, that provides investment advisory services primarily to high net worth individuals, has participated in the structuring of the Partnership and intends to recommend to certain of its clients that they become Limited Partners. Ballamor will receive no compensation for its participation or investment recommendation. However, George Levin has an agreement in

principle with Ballamor and its principal, Barry R. Bekkedam, with respect to an equity investment in Ballamor by Mr. Levin and a loan to Mr. Bekkedam, the final terms of which have not been determined. These transactions are in no way contingent upon the success of the Offering or Ballamor's participation therein.

77. This limited and incomplete disclosure led to questions from investors. In response, Bekkedam downplayed and denied the relationship between and among himself, Ballamor, and Levin.

78. For example, in a June 15, 2009 email, responding to an investor questioning the lack of formality and follow-up regarding an $8 million investment in the Banyon Fund, Bekkedam denied that he or Ballamor received any compensation:

> Please understand that this deal is a bit unusual in that Banyon is not in the fund business and my firm is doing this as an accomidation [sic]. I or my firm have received no compensation for setting this up and administering to it from anyone. I assure you however that your funds are safe and documentation is on the way.

79. In an August 4, 2009 email, one of Bekkedam's advisory clients that Bekkedam solicited for investment in the Banyon Fund questioned Levin's loan to Bekkedam:

> This conflict of interest is alarming to me. This type of info must be fully disclosed to the investment committee before funds are disbursed.

> Barry, why are you personally borrowing money from Mr. Levin?

80. In an effort to allay the investor's concerns, Bekkedam made a number of representations about his and Ballamor's relationship with Levin, including, among other things, that: "[t]here continues to be no compensatory relationship with either myself or Ballamor with this or any other investment"; and "Mr. Levin was aware that I was putting together some additional capital to invest in the company for this expansion and expressed an interest in participating."

81. In fact, Bekkedam and his affiliated entities engaged in several personal and business transactions with Levin and his affiliates that were concealed or never fully disclosed to

Banyon Fund investors, including: (1) an agreement to purchase Bekkedam's $3.182 million personal investment in Colorado bonds; (2) a cashless swap with Bekkedam's creditors of approximately $10 million of Bekkedam's personal and business debt in exchange for an aggregate $10 million interest in the Banyon Fund; (3) a commitment to invest up to $5 million in Ballamor; and (4) a $5 million investment—and commitment to invest an additional $13 million—in NOVA Bank, a bank founded by Bekkedam and others.

### a. Levin Agreed to Purchase Bekkedam's Investment in Colorado Bonds Worth Approximately $3.182 Million

82.     On March 1, 2009—just after meeting Levin, and while Levin and Bekkedam were forming the Banyon Fund —Bekkedam sold to Levin his personal interests in HWC Investors, LLC ("HWC Investors"), a municipal bonds deal involving the funding of the construction of a highway leading to a casino in Central City, Colorado.

83.     The total value of Bekkedam's investment in HWC Investors was approximately $3.182 million. Bekkedam, however, had previously borrowed $2 million from NOVA Bank and used his stake in HWC Investors as collateral.

84.     As part of his purchase, Levin agreed to assume Bekkedam's $2 million NOVA Bank loan and wired Bekkedam the remaining $1.182 million.

### b. Levin Relieved Approximately $10 Million in Bekkedam's Personal and Business Debt

85.     No later than June 2009, while Bekkedam was soliciting prospective investors in the Banyon Fund, Bekkedam asked Levin to help him restructure approximately $10 million in Bekkedam's personal and business debt.

86. Bekkedam owed approximately $10 million to ten advisory clients and other creditors who had loaned Bekkedam money years earlier to form Ballamor. Bekkedam convinced these creditors to release his debt to them in exchange for equivalent interests in the Banyon Fund.

87. Bekkedam and Levin then agreed to a cashless swap, whereby Levin granted Ballamor's creditors approximately $10 million in limited partnership interests in the Banyon Fund. In exchange, on June 30, 2009, Bekkedam signed a promissory note, agreeing to pay approximately $10 million to Levin's company Banyon Capital, LLC.

### c. Levin Agreed to Invest Up To $5 Million in Ballamor

88. On or about June 30, 2009, Levin executed a securities purchase agreement, wherein his company Banyon Capital, LLC agreed to invest up to $5 million in Ballamor. In exchange, Levin was to receive up to 5,000 shares of Class B membership interests in Ballamor.

89. On June 25, 2009, Ballamor's Chief Compliance Officer and General Counsel advised Levin and his associate: "Barry would like to draw $1 million immediately. He foresees an additional $500K to $740K over the rest of the year." Bekkedam then drew $1 million under the securities purchase agreement immediately upon finalizing the agreement with Levin.

### d. Levin Invested in NOVA Bank at Bekkedam's Request

90. In 2002, Bekkedam and a friend formed NOVA Financial Holdings, Inc. and its subsidiary, NOVA Bank, with Bekkedam serving as the Chairman of the Board of NOVA Financial Holdings, Inc. until he resigned in 2007.

91. Even after his resignation, Bekkedam continued to have an influence on NOVA Bank's overall strategy and direction. Additionally, over the years, Bekkedam was integral in

raising capital for NOVA Bank through his network of advisory clients and other relationships. In fact, at certain times, 50% to 70% of NOVA Financial Holdings, Inc.'s shareholders were advisory clients of Bekkedam and Ballamor. Bekkedam also participated in the NOVA Financial Holdings, Inc. stock offering and secured favorable loans from Nova Bank for advisory clients and himself.

92. Prior to June 2009, NOVA Bank faced financial difficulties and lost its "well capitalized" status for regulatory purposes. Federal bank regulators imposed requirements that it raise more capital in order to be in compliance with applicable bank regulations. NOVA Bank needed capital in order to qualify for funding that it was seeking through the Troubled Asset Relief Program ("TARP"), which was important to Bekkedam and his future plans for the bank.

93. In June 2009, in an effort to improve its capital position, NOVA Bank commenced an offering for 2,700,000 shares of its common stock at a price of $11 per share pursuant to a Confidential Private Placement Memorandum dated June 30, 2009. The NOVA Bank Private Placement Memorandum stated that the purpose of the $29.7 million offering was to increase NOVA Bank's capital ratios for regulatory compliance, and to fund acquisitions.

94. Bekkedam, along with others, secured a purported $5 million investment by Levin in NOVA Bank. However, Levin agreed to invest the $5 million only if he did not have to invest his own funds, in part because so much of his money was tied up in Rothstein's investment program. As a result, NOVA Bank agreed to loan Levin $5 million, which was wired to Levin's bank account on June 30, 2009. Levin immediately wired the funds back as a purported capital investment in NOVA Financial Holdings, Inc. Levin also agreed to invest up to an additional $13 million of his own money in NOVA Financial Holdings, Inc. (although, ultimately, he never did).

### e.  The Arrangements With Levin Were a Quid Pro Quo For Bekkedam's Securing Investments in the Banyon Fund

95.     Over the relevant time period, Levin became increasingly desperate in his communications with Bekkedam about the need for investors in the Banyon Fund.

96.     Levin's payments and other arrangements with Bekkedam and his affiliates were a quid pro quo for Bekkedam's delivering on his commitment to secure investment in the Banyon Fund, an arrangement Levin confirmed in an August 18, 2009 email to a business associate:

> The more I read what was promised and what has been delivered I am getting very angry!! Why because we have laid out an woeful lot of money for him in anticipation of these investments being made. That hasn't happened. No where near what was promised. I am now looking at the interest charges on $5,000,000 from his bank in order to buy? I believe we also put cash into this deal also. $2,000,000??? Was this for the Colorado bonds? . . .
>
> Then I am now paying 15% interest in getting his backers out of his company. Where they weren't getting a dime in income for years. That's another $1,500,000 in interest out the door. We have given him a line of credit of another $5,000,000. . . .
>
> Now I am obligated to buy 24% of a bank that under normal circumstances I wouldn't invest a dime in! . . .

97.     One day later, while forwarding by email a demand from Rothstein for additional funding, Levin wrote to Bekkedam that he was fully invested with Rothstein and that he needed his immediate help:

> Barry, I hesitated to send this to you. In the strictest of confidence I have decided to. As one of our inner circle you need to be aware of all that goes on between the parties. It would be great if when we meet tomorrow we had some very positive news for him! Better yet if we had some funds. . . . This is the mother load. He needs to open the faucet. I am fully invested with him. . . . I need your immediate help with this one. . . .

98.     In October, Levin emailed Bekkedam, stating: "I am starting to get into a box again with [Rothstein's] deals! [A prospective investor] hasn't come to the table yet. Other than

emergency funds of two weeks ago. You should be moving as we have discussed. Don't get blind sighted again. We can use all the funds we can raise. I will always protect you and your investors as if they were me. You are on my side of the ledger. JUST NEED FUNDS!!"

99.     In response, Bekkedam assured Levin of several sources for additional investment in the Banyon Fund, and then thanked Levin while asking Levin to provide the cash he promised for one of Bekkedam's deals: "As always thank you for everything. Please remind [Levin's associate] that I need to close the Nova Bank capital by Wednesday per my email last week. It is a hard deadline to qualify for TARP. Very important."

### G. Bekkedam Violated the Federal Securities Laws

100.     At all times relevant to the complaint, Bekkedam acted as an investment adviser to his investment advisory clients.

101.     As an investment adviser, Bekkedam owed his investment advisory clients a fiduciary duty, including the duty to provide full and fair disclosure of all material facts regarding the investments on which Bekkedam advised such clients.

102.     Limited partnership interests in the Banyon Fund were securities.

103.     Bekkedam knowingly or recklessly made misrepresentations and omissions of material fact in connection with his solicitation of his advisory clients and other prospective investors to invest in the Banyon Fund.

104.     The PPM and the LPA contained misrepresentations and omissions when Bekkedam was soliciting his advisory clients and others to invest in the Banyon Fund.

105.     Bekkedam knew, or was reckless in not knowing, that the PPM and the LPA contained misrepresentations and omissions when Bekkedam was soliciting his advisory clients and others to invest in the Banyon Fund.

106.     Bekkedam's, the PPM's, and the LPA's misrepresentations and omissions were material.

107.     Bekkedam had a fiduciary duty to provide full and fair disclosure of all material facts regarding the Banyon Fund to his advisory clients.

108.     Bekkedam had a duty to provide full and fair disclosure of all material facts regarding the Banyon Fund in connection with his positive statements regarding that investment and recommendation that his advisory clients and other prospective investors purchase limited partnership interests in the Banyon Fund.

109.     Bekkedam had a duty to disclose, inter alia, the material misstatements and omissions in the PPM and LPA in connection with his positive statements regarding that investment and recommendation that his advisory clients and other prospective investors purchase limited partnership interests in the Banyon Fund.

110.     Bekkedam breached his fiduciary duty to his advisory clients by making material misstatements and omissions regarding the Banyon Fund.

111.     Bekkedam breached his duty to his advisory clients and the prospective investors to whom he made positive statements regarding the Banyon Fund and recommended that they purchase limited partnership interests in the Banyon Fund by failing to disclose material facts regarding the Banyon Fund.

112.     Bekkedam's material misstatements and omissions were made in connection with the purchase or sale of a security.

113.     Bekkedam's material misstatements and omissions were made by use of the means or instrumentalities of interstate commerce or the mails.

114. Bekkedam, directly or indirectly, obtained money or property by means of a material misstatement or omission in the offer or sale of the limited partnership interests in the Banyon Fund.

115. At all times relevant to this complaint, Bekkedam acted knowingly or recklessly.

## CLAIMS FOR RELIEF

## FIRST CLAIM

## Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder

116. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 115, inclusive, as if they were fully set forth herein.

117. From April 2009 through October 2009, as a result of the conduct alleged herein, Bekkedam, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

118. By engaging in the foregoing conduct, Bekkedam violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R.§ 240.10b-5(b)].

## SECOND CLAIM

## Violations of Section 17(a)(2) of the Securities Act

119. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 118, inclusive, as if they were fully set forth herein.

120.    From April 2009 through October 2009, as a result of the conduct alleged herein, Bekkedam, knowingly or recklessly, in the offer or sale of securities, directly or indirectly, by the use of the means or instruments of transportation or communication in interstate commerce, or the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, obtained money or property by means of untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

121.    By engaging in the foregoing conduct, Bekkedam violated and, unless restrained and enjoined, will continue to violate Section 17(a)(2) of the Exchange Act [15 U.S.C. § 77q(a)(2)].

### THIRD CLAIM

### Violations of Sections 206(1) and 206(2) of the Advisers Act

122.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 121, inclusive, as if they were fully set forth herein.

123.    From April 2009 through October 2009, as a result of the conduct alleged herein, Bekkedam, directly or indirectly, by use of the mails or the means or instrumentalities of interstate commerce while acting as an investment adviser:

     a.  with scienter, employed devices, schemes, or artifices to defraud advisory clients or prospective advisory clients; and

     b.  engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

124.    By engaging in the foregoing conduct, Bekkedam violated and, unless restrained and enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter a final judgment:

### I.

Permanently restraining and enjoining Bekkedam and his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Permanently restraining and enjoining Bekkedam and his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

### III.

Permanently restraining and enjoining Bekkedam and his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)];

## IV.

Ordering Bekkedam to disgorge any and all ill-gotten gains, together with prejudgment interest thereon, derived from the activities set forth in this complaint;

## V.

Ordering Bekkedam to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9];

## VI.

Retaining jurisdiction of this action for purposes of enforcing any final judgment and orders; and

## VII.

Granting such other and further relief as this Court may deem just and appropriate.

Respectfully submitted,

Dated: April 30, 2014

Sharon B. Binger
Brendan P. McGlynn (PA Bar No. 77271)
Kelly L. Gibson (PA Bar No. 91753)
G. Jeffrey Boujoukos (PA Bar No. 67215)
Christopher R. Kelly

Attorneys for Plaintiff:

SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA 19106
Telephone: (215) 597-3100